Your argument in the final case on the calendar in Empire State Carpenters versus Conway Construction of Ithaca. May it please the Court, Joseph Steflik for Conway Construction. The March 15, 2012, decision of the lower court, if affirmed, would prevent parties to a collective bargaining agreement from negotiating the means and methods of terminating that agreement. This would make it more difficult to terminate an 8F agreement than a traditional 9A agreement and overturn 80 years of NLRA precedent. The 8F pre-hire recognition in the construction industry was specifically designed for a particular type of work. Construction client, construction companies usually form without employees. You've got two hurdles. Yes. First, the language of the agreement, and then second, of course, the CLAWA decision. Why don't you address the language and then the decision itself, and whether or not we should defer to it. Yes. The Article 15, Section 2 of the Collective Bargaining Agreement, in effect from 2001 to 2006, states, quote, this agreement shall remain in force, in effect, through April 30, 2006, unless written notice of intent to seek change or amend the positions of this agreement shall be given in either case by the parties desiring such change or amendment at least 90 days prior to the expiration date, end of quote. The lower court correctly stated this was not an evergreen clause. In fact, if you look at the subsequent agreement that was after our 2006 to 2009, it did contain an evergreen clause. So you look at that language, it is not an evergreen clause. As long as it's not an evergreen clause, then you look at the unless. This agreement remained in effect through April 30, 2006, unless something happens. And that something that happens is the notice. And that's traditional in an 8F agreement. It says unless it's changed or amended. Why didn't you ask for it to be changed? You said you had a good faith reason that you could no longer comply because of conditions in the construction industry. You could have asked to change or amend the Collective Bargaining Agreement. Well, the Collective Bargaining Agreement, the use of the word change or amendment constitutes also determination. Well, so you say. But it seems to me that you change or amend an ongoing agreement and that it assumes that the agreement continues. Not necessarily. If you look at the affidavit from David Weaver, who was the negotiator, he testifies as to what that language meant from prior agreements and this agreement. And, in fact, Judge, the lower court said that the term was ambiguous and needed clarification. There were two sets of affidavits, one from Mr. Weaver and one, I think, from Mr. Haynes, I believe it was Mr. Haynes or Mr. Pavlik, that said that diametrically opposed interpretations of that section. The tradition in the construction industry for an 8F agreement prior to DECLA was that you could terminate it at any time. Under a 9A agreement, which, again, is not involved here, then it's up to the parties to decide how the termination. What DECLA did, just kind of jumping to DECLA in a minute, what DECLA did was say, okay, even though, and DECLA, I think, was 1987, they said, the NLRB decided that, okay, we're going to treat 8F a little more like a 9A agreement in that you can't automatically terminate the agreement. What you can do is you have to follow the terms of the agreement. I think if you look at the Labonte drywall case is a good example of that. DECLA left, as in this agreement, up to the parties to decide how the agreement was going to be terminated and the means and mechanism. The language, change or amend, is traditional language in the construction industry, I think, as Mr. Weaver gave his affidavit to and, in fact, said. Then he also gave in his affidavit that, quote, no union representative, either during negotiations or during administration of the collective bargaining agreements prior to 2006, ever challenged or disputed that interpretation. That's the reason that the union changed it after 2006 to comply with both DECLA and the NLRB. Now, if plaintiff's interpretation of Article 15.2 is correct, it would be correct if it ended right there where it said effective through April 30, 2006, and, of course, it doesn't end there. It says the unless. Now, also in the construction industry, if you take that interpretation, both under the NLRB and the NLRB, a lot of agreements would be invalid on their face, for instance, project agreements. Construction companies who are nonunion often enter into project agreements with a labor organization to abide by the terms of the collective bargaining agreement, particularly with regard to wages and fringe benefits for a particular project. Also in some projects, particularly in New York, you have what are called project labor agreements. Project labor agreements require that the contractor abide by the collective bargaining agreement for that particular project. The Tappan Zee Bridge is one example. Another one was rejected in the city of Binghamton that I was familiar with. It's a too broad interpretation from the court below as to the impact of DECLA and the language. I think if you look at, again, Judge Corman's question, the lower court said it was ambiguous and they couldn't resolve on the first decision. On the second decision, the lower court again said it was ambiguous, but we don't have to reach that because DECLA prohibits it from being interpreted that you can terminate during the . . . I read the DECLA opinion on the NLRB. I didn't understand it to say that you couldn't put a provision and the parties couldn't agree in the contract that it could be terminated. I understood it when I read it. I don't understand it at all to say that in the absence of such an agreement, it was contrary to public policy to allow it to be terminated at will. I think you're correct. I think members Babson, Dotson, and I can't remember the third member, but they said all they were doing was making . . . neither party could unilaterally terminate the agreement, but they can't . . . but there's nothing to prohibit, I think under DECLA and the board decisions after that, there's nothing to prohibit the parties from internally agreeing how the mechanism is going to work for terminating. And you have some of those in, I know, Teamster Agreements. Parties can let the other party know that they're going to either amend or change or terminate the agreement. So I agree with you that DECLA only dealt with, and I think that's where the lower court made a mistake, but DECLA decision, as affirmed, only dealt with the fact that it's changing the prior rule that parties to an 8F agreement could not unilaterally change it without some provision in the collective bargaining agreement. That's always been the rule for a 9A agreement. The parties could not unilaterally terminate the 9A agreement, but they could terminate the agreement if there was a provision in the collective bargaining agreement. And I think the parties . . . just shortly . . . Conway did that. They sent the notices. They gave the proper notices, even if the collective bargaining agreement was applicable. And the union never contested it, in fact, treated Conway Construction as a non-union contractor. Are you not going to argue that you were not bound by the agreement? I don't think we were bound by the agreement. And if we're not bound by the agreement, then the rest of the argument is obviously perfect. That's your very first argument, is that you were never bound by the agreement. Yes. And, of course, the counterargument is that your conduct showed otherwise. Right. And the conduct was two things. We paid the prevailing wage rate, similar to the last case, and we paid the fringe benefits. But that's true . . . And you also signed some document as well that sort of . . . We sent the . . . we . . . you had to sign the fringe benefit form or the men would not have been credited with the payment. And that said, we were bound by that trust document and the collective bargaining agreement for that purpose. But that's done in every project labor agreement or project agreement. Is there not a way to . . . The standard under the Brown case is that absent contrary evidence, conduct that seems to suggest that you were bound can show that you were bound. But the determinative thing is whether you manifested an intention not to be bound. Yes. And it was my impression that you . . . it was my impression that you said we don't want to join this . . . to come on board this agreement because we don't want . . . we're not sure that we want to be bound for the long duration, the three-year duration that it has. That is correct. And especially in this . . . That seems to be evidence that evidence is an intention not to be bound. Yes. And I agree with that. And in particular in this case where we . . . Conway was not a member of the trade association. They did it separately. And then they removed themselves . . . they . . . in the notice, the proper notice later on under the collective bargaining, if it were bound, they gave notice both to the trade association . . . Did you manifest an intention not to be bound? Yes. The manifest . . . the intention was telling them we did not want to be bound by this agreement. We were not a member of the association, but we were willing to pay the fringe benefits and the . . . and the wages in order to do these prevailing wage rate projects. So, can you point to the place where the evidence is that you submitted to the court of your manifesting an intention? The evidence is Mr. Conway's affidavit saying that he never intended . . . he did not want to be bound by the collective bargaining because it was too long and they didn't know if they could afford it. And I wasn't going to answer my questions because I'm asking you not what Mr. Conway felt or wanted or didn't want. I'm asking what he manifested to the other side. He manifested it by only paying the wages and the fringe benefits. I think one of the claims that the union made was we didn't pay the industry advancement funds. We did not pay the industry advancement funds. We didn't comply with all the terms of the collective bargaining. Saying that he never said to the union, I'm not . . . I don't want to join this . . . he never said to the county party, I'm refusing to become a party to the CBA. He said that in his . . . he states that in his affidavit that he said that to the union. He says that he said it to the union? Yes. Or just that he didn't . . . No, I believe he said he said it to the union. I'll revise it during the appellant's argument. That's a very important difference. I think so. I think you're correct, Your Honor. Thank you. You have two minutes for rebuttal. May it please the court, my name is Marty Fohas, counsel for the plaintiffs, the Empire State Benefit Funds. Your Honors, the judgment of the district court should be affirmed for three reasons. First, no one disputes that Conway engaged in conduct, which pursuant to this court's decision in the Brown case, constitutes a manifestation of its intention to be bound by the 2001 collective bargaining agreement. Second, Section 15.2 of the 2001 collective bargaining agreement, which Mr. Stifler just pointed to, doesn't say anything regarding the termination of the agreement. That is the only provision in the agreement that is pointed to by Conway as permitting it to unilaterally terminate the agreement at any time. You say the judge probably was wrong when he said it was an ambiguous clause? That appears in the 2010 decision of the district court. The judge took pains to say that the parties at that point had not briefed the issue and that issue was not fully argued before the court. He proceeded in his second opinion, he discusses the extrinsic evidence, which proceeds on the premise that he found in his original opinion that the clause was ambiguous. That's correct. If you look at just the clause that is cited by the parties, the 15.2, it may be unclear as to what that provision means, but it appears... The answer to my question is he was correct that it was ambiguous. We do not agree that that's the holding of the district court. The district court said in its 2012 opinion that the language of the agreement does not lend itself to the interpretation that it provides a unilateral right of termination. He took extrinsic evidence and, as I understand it, he rejected an affidavit, the so-called extrinsic evidence of someone who bargained, who was involved in negotiations, Weaver. He said that he couldn't accept it because as he read this, I may not be pronouncing it right, this Decluar case, it was contrary to the Decluar, it would be contrary to Decluar to construe it to allow for each party to terminate it. I don't read that opinion the same way. Do you say that Decluar prevents a union and an employer counterpart from putting a provision in a collective bargaining agreement permitting one side or the other to terminate it before it's otherwise, the date it would otherwise expire? We do, and the John Decluar decision... Could you show me or cite me to where it says that? In the Decluar decision, it's cited in our brief, and it says that... I printed it out on Westlaw, unfortunately. It says the obligations when parties to enter into an ADEF agreement, they will be required to comply with that agreement unless the employees vote in a board-conducted election, reject or decertify the bargaining representative. Neither employers nor unions who are party to ADEF agreements will be free unilaterally to repudiate such agreements, and it says further that the obligations we impose on an ADEF employer are limited to prohibiting the unilateral termination of the agreement until it expires. And so to the extent, let me go back and preface this by saying that this is not typically a concern that reaches the members who are negotiating collective bargaining agreements because it doesn't come up. The purpose of a collective bargaining agreement is to stabilize conditions in a particular industry, such as the construction industry for which ADEF was enacted. The fear that parties will unilaterally terminate that agreement will destabilize the industry, so there's no reason that any party would agree to it. The issues raised by... That's a separate issue that no party would agree to it. This is separate from saying that there was a ruling in this case that they couldn't agree that they could have an early termination depending on what the circumstances were. It could arguably benefit the union at some point to have this right. I agree with that, Judge Corman. And this is, I believe, illustrated by the example that Mr. Suffolk pointed out, which is the project-specific agreements, that it is customary for non-union signatories to participate or to conduct work on one-job agreements,  of a separate collective bargaining agreement for the purposes of being able to conduct work on a union job, a prevailing wage job, a job subject to a project labor agreement. Now, those are separate ADEF agreements. They're typically a one-page agreement. They're called short-form agreements in some cases, and they say, we will agree to abide by the terms of this other collective bargaining agreement for a fixed period of time, until the end of the project. Nothing in that seems to violate, to my lights, the DECLO decision. That is an agreement as to the expiration of that provision, which is at the end of the project. What DECLO is concerned with is the parties who have agreed, and we're talking in this case about the union and an employer's association, the CTE, which negotiated a collective bargaining agreement that was pretty much industry-wide, covered several member employers of the CTE and bound several of the labor unions, the local unions in the region. So we're talking about more significant stakes in agreeing to this collective bargaining agreement. It's not a one-on-one agreement between the employer and the union. Now, the effect of the DECLO decision is to say that if the employers and the union have entered into an agreement whereby there is a fixed schedule for prevailing wage rates, a fixed term of the agreement, this will go on for five years, for six years, that that period should be a stable period until the next agreement is entered into. And that is the purpose of the Section 15 of the 2001 Collective Bargaining Agreement. It contains language that says that the agreement will expire in April 2006 unless, and this is where that language comes in that Mr. Suffolk referred to, unless the parties express their intent to seek to change the agreement. It is an expression of their intent not to impose any obligations on any other party to the agreement. Is there any way for, before the expiration date, was there any way for Conway to terminate the agreement? Yes. The agreement also provides, within Section 15, two lines down from the language that we're talking about, there is a separate provision that says if the parties seek to reopen the agreement, they have to do so by mutual assent. And that provision is inconsistent with an interpretation of lines that appear in the same section of the agreement that says any party can walk away at any time. Of course, that's inconsistent with the idea of unilateral impedition. That's correct. So I'd like to ask you about your first point on Brown. Brown said that the conduct, which was also present in this case, was, quote, absent contrary evidence to establish as a matter of law the employer's intent to adopt the unsigned CBAs. Yes. Now, your adversary says, in response to my question, that in this case, Conway explicitly manifested an intention not to join, not to become a party to the CBA. And so I don't understand. If he's correct that there was evidence that he manifested an intention not to contract the CBA, then it doesn't come within Brown. And it's a case in which he agreed that he would go along and pay the union wages and make the contributions to the funds, but he wasn't agreeing to bind himself to the agreement for its duration, that he would do it and comply for as long as he wanted to. That's correct, Judge Lovell, if that were the situation that was in front of us today. But it's not. Conway submitted an affidavit stating that he never intended to become a member of the union. But that's really the only evidence that was presented to the district court. He didn't present any evidence that he manifested to the counterparty the intention not to join it? He just said, I didn't intend to, but he didn't put in evidence of his saying to the other side that I don't want to? The statements in the record that Conway did not intend to be bound by the CBA occur in the middle of this 2001 to 2006 period. It occurs in April 2003, or between January and April 2003. That is when John Conway, the principal of Conway, had conversations with members of the union stating that he no longer wished to be bound by the CBA. That is not the same as prior to the execution of the 2001 CBA that he doesn't want to be bound by. He participated in, he took union laborers, he paid benefits, he submitted the reports that Judge Corman referred to earlier. All the conduct that was found to be a manifestation of intent to be bound in Brown is present here. And the only indication that he did not intend to be bound is this 2003 conduct in the middle of the term that he doesn't want to be bound anymore. And that goes to the language of Section 15 and whether that can be permissibly read as permitting him a unilateral right to repudiate. If there are no further questions, we'll rest on our papers. Thank you. In answer to Judge LaValle's question, the Record 826, Paragraph 5 of Mr. Conway's affidavit states the following. Quote, I had several meetings with representatives of Local 603 and its successors, Carpenters Local 281, and Empire State Regional Council Carpenters Empire State from 1998 through 2003. During those meetings, I agreed to pay union scale and benefits as long as my customers could afford them but consistently refused to sign any written agreement. Particularly in 2000 and 2001, I refused because the applicable agreement would have run from May 1, 2001, through April 30, 2006. A question under DECLA law from Judge Corman. In the decision, DECLA also says, again, it was a unanimous panel, I believe, the enforceable Section 9A status we confer on signatory unions is also only coextensive with the bargaining agreement that is the source of its exclusive representational authority. So, again, they emphasized that they derived the authority from 8F and 9A from the collective bargaining agreement. Beyond the operative term of the contract, the signatory union acquires no other rights and privileges of 9A exclusive representation. Just to make sure that I understand. Yes, sir. Are you suggesting that even if we were to adopt DECLA law, you could pay? Yes, absolutely. Because DECLA law and the cases cited in the reply brief, and I won't go over them again, even under a 9A agreement, which would be the rights that would be given under the 8F under DECLA law, the parties can still determine the method and means of terminating the agreement. Unilateral has a specific meaning pre-DECLA law. Unilateral was, in an 8F agreement prior to DECLA law, that either side could just tell the other side, I don't want to be bound by the collective bargaining and walk away from it. If the circuit adopts DECLA law, you still can make the termination or change or amendment under the collective bargaining agreement. There's nothing in DECLA law or any cases afterwards that determine that the parties cannot do that. And if you look at Labonte-Drywell, and I think Judge Souter was on the panel, they state exactly that, that even under DECLA law, the parties can agree how to terminate an agreement. Pursuant to the agreed-upon termination provision of the estate by degree and subject to its terms and conditions. And that's an example of where it was included, and there's many other examples in the brief, but that's where the, I think the First Circuit, stated that. Where was that? In the Labonte case. Cited in my brief and in the required brief, predominantly in the original brief. Labonte-Drywell. Well, if you are right, then it seems to me Judge Hurley, in rejecting the extrinsic evidence, abused his discretion because he rejected the extrinsic evidence because he was operating on the assumption that you couldn't, the parties couldn't agree. So it didn't, in effect, his reading of it was based on an erroneous legal premise. I think that's absolutely correct. My understanding was that Judge Hurley, but again I may be wrong, rejected the affidavit of Mr. Weaver. In large part because it conflicted with prior statements made in prior affidavits by Mr. Weaver. No, I think he took those into consideration. I think his predominant reason for it that he rejected was it didn't matter because under DEC law the parties couldn't agree to an illegal term. I agree with that. If it's an illegal term, such as the old Pullman agreements with the railway industry where minorities were limited under the collective bargain to certain jobs, I agree 100%. If it's illegal, the parties can't agree to it. But here, I think the combination was Mr. Weaver's affidavit is, but that again becomes a question of fact. The correct ambiguity in summary judgment, I think in decisions by all of you, if there's a question of fact, summary judgment cannot be granted. The same thing in Mr. Conway's affidavit too. Yes. All right. Thank you very much for the reserved decision. This ends today's calendar and I'll ask the clerk to adjourn the Court. Thank you very much, Your Honor. Court stands adjourned.